UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION FOR
SEARCH WARRANTS FOR:

THE PREMISES KNOWN AND DESCRIBED AS:

Unit 5209 at Public Storage Located at
3204 Northern Blvd., Long Island City, New York

AND ALL LOCKED AND CLOSED CONTAINERS
FOUND THEREIN

- - - - - - - - - - - - - - - - - - - - - X

<u>S~~EALE~~D AFFIDAVIT IN
SUPPORT OF APPLICATION
FOR SEARCH WARRANT</u>

EASTERN DISTRICT OF NEW YORK, SS:

      JESSE PRESCOTT, being duly sworn, deposes and states that he is a Special Agent with the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such. Upon information and belief, there is probable cause to believe that there is located in THE PREMISES KNOWN AND DESCRIBED AS Unit 5209 at Public Storage Located at 3204 Northern Blvd., Long Island City, New York, AND ALL LOCKED AND CLOSED CONTAINERS FOUND THEREIN (the "SUBJECT PREMISES"), which constitute evidence, fruits and instrumentalities of conspiracy to distribute methamphetamine in violation of Title 21, United States Code, Section 846.

      The source of your deponent's information and the grounds for his belief are as follows:[1]

      1.    I have been employed as a Special Agent by the DEA for almost 14 years, and am currently assigned to D-43, where I investigate crimes involving narcotics

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for search warrants, I have not set forth each and every fact learned during the course of the investigation.

trafficking. During that time, I have personally participated in numerous investigation of unlawful drug distribution and have conducted or participated in surveillance, undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payments for such drugs.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement authorities; (c) information obtained from confidential sources of information; (d) interviews with witnesses and victims; and (e) the review of other records and reports. When I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

## PROBABLE CAUSE EXISTS TO SEARCH THE SUBJECT PREMISES

3. As described in greater detail below, the DEA began an investigation into methamphetamine distribution between New York and Michigan in or about July 2014. In connection with that investigation, law enforcement agents have been assisted in this investigation by a confidential source (the "CS") who has been charged with violating federal narcotics law, and is providing proactive assistance to law enforcement in the hopes of obtaining a cooperation agreement and more lenient treatment at sentencing. Information

3

provided by the CS has been corroborated by, among other things, cell phone text messages and the seizure of narcotics by law enforcement.

4. From speaking with the CS, I have learned the following, in substance and in part:

a. In or about July 2014, prior to the CS's arrest on federal narcotics charges, and not acting at the direction of law enforcement, the CS met with an individual who identified himself to the CS as "Kyle" at a location in Manhattan (the "Manhattan Location"). During this meeting, the CS and "Kyle" discussed, in substance and in part, the terms under which "Kyle" would sell the CS a quantity of crystal methamphetamine.

b. On multiple other occasion between in or about July 2014 and in or about September 2014, the CS, again not acting at the direction of law enforcement, met with "Kyle" at the Manhattan location to discuss, in substance and in part, terms under which "Kyle" would sell the CS a quantity of crystal methamphetamine.

c. During the most recent meeting between the CS and "Kyle," in or about September 2014, the CS purchased approximately 3.5 grams of crystal methamphetamine from "Kyle." The CS did not make this purchase at the direction of law enforcement. The CS provided law enforcement with the substance he purchased from "Kyle" in or about September 2014 within approximately one week of making that purchase. I have spoken with the law enforcement agent who took possession of the purchased substance, and that law enforcement agent informed me, in substance and in part, that the

purchased substance was a clear, hard, rock-like substance with the texture and consistency of crystal methamphetamine.

        d.     At the most recent meeting between the CS and "Kyle," in or about September 2014, "Kyle" provided the CS, in substance and in part, with his cellphone number (the "Target Cellphone Number").

        5.     Based on my review of a text message exchange on the CS's cellular phone, I learned the following, in substance and in part:

        a.     On or about October 26, 2014, a person using the Target Cellphone Number sent the CS a text message asking, in substance and in part, "You need Tea?" Based on my training and experience, I have learned that "tea" is a street term for crystal methamphetamine.

        b.     At the direction of law enforcement, the CS responded by text message, stating, in substance and in part, that the CS would like to purchase at least three or four "zippers." Based on my training and experience, I have learned that a "zipper" is a street term for an ounce of crystal methamphetamine.

        c.     The person using the Target Cellphone Number responded, in substance and in part, that they were waiting for a new delivery, which would probably arrive on or about October 31, 2014.

        d.     On or about November 5, 2014, at the direction of law enforcement, the CS communicated by text message with the Target Cellphone Number. On

that date, the following text message exchange took place between the CS and the person using the Target Cellphone Number:

> CS: Am def interested in what we discussed
>
> CS: 3-4
>
> Target Cellphone Number: Cool
>
> Target Cellphone Number: I have 2 kinds
>
> CS: 2 kinds?
>
> CS: Could I get 2 of each kind?
>
> Target Cellphone Number: Yes.
>
> CS: Cost
>
> CS: ?
>
> Target Cellphone Number: 1400 each
>
> CS: That works
>
> CS: Thanks
>
> Target Cellphone Number: Thanks
>
> CS: 5600 right
>
> Target Cellphone Number: Yes
>
> Target Cellphone Number: The Pieces are huge

Based on my training and experience, and my review of the text messages discussed above, I believe these communications are a discussion about the sale of four ounces (or approximately 113 grams) of crystal methamphetamine for $5,600.

6

      6.     On or about November 5, 2014, another law enforcement agent ("Agent-1") and I observed an individual later identified JAMES MARADEN at a location in Queens New York, at which time Agent-1 and I both took photograph of MARADEN. Agent-1 provided the CS with that photograph, and the CS stated, in substance and in part, that the person depicted in the photograph appeared to be the individual, "Kyle," with whom the CS had previously met on multiple occasions in Manhattan.

      7.     Agent-1 and I then followed JAMES MARADEN to a subway platform in Queens, New York. At that time, Agent-1 and I observed MARADEN carrying a black, medium-sized backpack (the "Backpack").

      8.     Agent-1 and I approached JAMES MARADEN on the subway platform, both of displayed our badges, and Agent-1 stated, in substance and in part, that he was a federal law enforcement officer. MARADEN turned away from Agent-1, and then boarded a subway train that had just arrived.

      9.     Agent-1 and I followed JAMES MARADEN onto the subway train. At that time, Agent-1 once again displayed his badge and stated, in substance and in part, that he was a federal law enforcement officer, and ordered MARADEN to get off of the train. MARADEN refused to comply with this order. Agent-1 and I then grabbed MARADEN and forcibly escorted him off of the subway train.

      10.    Thereafter, JAMES MARADEN threw the Backpack on the ground, and attempted to run away. A struggle ensued between Agent-1 and me and MARADEN.

7

During that struggle, MARADEN elbowed me in the head, and grabbed me and threw me to the ground. Eventually, MARADEN was handcuffed and placed under arrest.

11. After JAMES MARADEN, was detained, he stated, in substance and in part, that the Backpack, which he had thrown to the ground, was not his. A subsequent search of the Backpack uncovered the following items, among others:

a. Multiple plastic baggies containing a clear, hard, rock-like substance which field tested positive for the presence of crystal methamphetamine. The baggies containing that substance were weighed, and the aggregate weight of the baggies and substances contained therein was approximately 79 grams.

b. A digital scale.

c. Small plastic baggies.

d. A piece of paper displaying the following information: "Northern Blvd. LIC Public Storage *26324174 # Unit 5209." A picture of this piece of paper is attached hereto as Exhibit A.

Based on my training and experience, I believe individuals involved in drug trafficking use items such as digital scales and small plastic baggies to engage in drug trafficking. Additionally, based on my training and experience, individuals involved in trafficking narcotics often use stash houses and/or storage facilities to store illegal narcotics, as well as currency, among other types of contraband.

12.     After JAMES MARADEN, was arrested, a cellular phone (the "Maraden Phone") and a set of keys (the "Maraden Keys"), among other items, were found on his person.

13.     When I placed a call to the Target Cellphone Number, the Maraden Phone immediately began ringing.

14.     Other law enforcement agents and I returned to a location in Queens where I had previously observed MARADEN, and found that one of Maraden Keys fit into the lock on the front door of an apartment building near that location. A person who informed me that they were a resident of that building identified a photograph of MARADEN as depicting a resident of a particular apartment (the "Maraden Apartment") in that building.

15.     Other law enforcement agents and I found that another one of the Maraden Keys fit into the lock for the front door to the Maraden Apartment. Other law enforcement agents and I then entered the apartment. Shortly thereafter, a person who identified themselves as a resident of the Maraden Apartment entered that apartment, and provided oral and written consent to search the Maraden Apartment.

16.     During a search of the Maraden Apartment, I and other agents seized the following items, among others:  multiple containers and plastic baggies containing a clear, hard, rock-like substance which field tested positive for the presence of crystal

methamphetamine; [2] multiple containers containing a quantity of a brownish, rock-like substance, with the texture and consistency of methylenedioxy-methamphetamine, commonly referred to as "MDMA" or "Molly"; a powder-like substance believed to be ketamine; syringes and at least two vials that were believed to be steroids and were labeled "testosterone." Approximately $10,000 was recovered from the closet in the MARADEN's bedroom. Additionally, I found an envelope that appears to be a registration form for the storage locker described in Exhibit A. A picture of that envelope is attached hereto as Exhibit B.

17. Subsequent to his arrest, I helped transport JAMES MARADEN to a hospital. MARADEN stated to me, in substance and in part, that MARADEN would find me, and that I would "get [mine]," that MARADEN hated law enforcement officers, and wished he would have killed me.

18. From speaking with another law enforcement agent ("Agent-2"), who was guarding JAMES MARADEN at a hospital following MARADEN's arrest, I learned that MARADEN stated to Agent-2, in substance and in part, that MARADEN would "crack your head, just like the others."

## THE SUBJECT PREMISES

19. Based on the information contained on Exhibits A and B which were recovered from MARADEN, another law enforcement agent (Agent-3) traveled to Public

---

[2] The containers and baggies containing that substance were weighed, and the aggregate weight of the containers, baggies and substances contained therein was approximately 538 grams

Storage, located at 3204 Northern Boulevard, on or about November 6, 2014. Agent-3 learned that Storage Unit 5209 has been rented by an individual who provided the name "Brian Weiss," but listed the Target Cellphone Number as his contact information. An employee from public storage confirmed that, in order to access the premises after hours, one would need to enter the following code: *26324174#. This is the same code that appears on the scrap of appear depicted in Exhibit A and the enveloped depicted in Exhibit B. Agent-3 then observed Unit 5209, which appears to be a small storage closet, with a wood door that is painted white and labeled with the numbers "5209".

## REQUEST TO SEARCH

20. Based on my training and experience, individuals involved in narcotics trafficking often use stash houses and/or storage facilities to store narcotics, currency, and other contraband. To the extent that an individual involved in narcotics trafficking rents a storage facility, they often use aliases or fake names on registration documents.

21. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the SUBJECT PREMISES there exists evidence of crimes. Accordingly, a search warrant is requested.

## CONCLUSION

22. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing criminal investigation, and

11

that not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS Unit 5209 at Public Storage Located at 3204 Northern Blvd., Long Island City, New York and all locked and closed containers found therein (the "SUBJECT PREMISES").

IT IS FURTHER REQUESTED that all papers submitted in support of this application, including the application and search warrant, be sealed until further order of the Court.

_____
Jesse Prescott
Special Agent
Drug Enforcement Administration

Sworn to before me this
6th day of November, 2014

_____
THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

THE PREMISES KNOWN AND DESCRIBED AS Unit 5209 at Public Storage Located at 3204 Northern Blvd., Long Island City, New York, AND ALL LOCKED AND CLOSED CONTAINERS FOUND THEREIN:

a.  Narcotics and paraphernalia related to the storage and distribution of narcotics, including, but not limited to, glassine envelopes, grinders, plastic bags, scales, stamps, labels, drug presses, vials, and cutting agents;

b.  United States currency;

c.  Books, records, receipts, notes, ledgers and other papers and evidence relating to violations of narcotics laws, including but not limited to correspondence with individuals, real estate and property records, airline travel records, rental car receipts, ledgers, and billing records for telephones and other electronic devices, faxes, printed e-mails, and identification documents, including driver's licenses, passports, other travel documents, and social security cards;

d.  Books, records, receipts, bank statements, credit card records, money drafts, letters of credit, money order and cashier's checks and receipts, passbooks, bank checks, and other items evidencing violations of narcotics laws;

e.  Photographs related to the distribution of narcotics;

f.  Indicia of ownership or control of the premises, vehicles and other property, including, but not limited to, utilities and telephone bills, canceled envelopes, and keys (including safe deposit box keys);

g.  All cellular telephones, blackberries, Sidekicks, iPhones or other personal handheld electronic or computer devices, including their contents;

h.  Books, records, notebooks and other written materials used to store names, addresses, telephone numbers and/or paging numbers for criminal associates, victims and other information relevant to violations of 18 U.S.C. §2113;

i.  Weapons and other devices that could be used during and in relation to narcotics distribution, including but not limited to firearms, knives, other weapons;

j.  Any safes, key-lock strong boxes, suitcases, containers, and other boxes or instruments secured by combination and/or key locks of various kinds that may contain items described above in paragraphs (a) through (j) of this Attachment;

all of which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846.

# EXHIBIT A

Unit 5209

#44

# EXHIBIT B